DOWD, J.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

American Winds Flight Academy, et al.,  )
                                        )   CASE NOS.    5:07 CV 3401
            Plaintiffs,                 )                5:07 CV 3402
                                        )
       v.                               )
                                        )
Garmin International, et al.,           )
                                        )
            Defendants.                 )
_____ )   MEMORANDUM OPINION
The Estate of Alan L. Lyons,            )
                                        )
            Plaintiff,                  )
                                        )
       v.                               )
                                        )
Garmin International, et al.,           )
                                        )
            Defendants.                 )
                                        )

Tragedy struck on October 14, 2005, when a Lancair 235 occupied by Jack Plavcan and

Mark Schaden and a Cessna 172L piloted by flight student Chris Erdovegi under the supervision of

instructor Alan Lyons collided in the skies above Rootstown, Ohio.  All four men perished in the

crash.  The Lancair, which instigated the collision, was equipped with a Garmin GNS 430 navigation

unit capable of, among other things, displaying a moving map that charted the progress of the plane

in flight (represented by a white airplane icon) relative to a desired course (represented by a magenta

line).  Plaintiffs in these related cases sued Garmin International, the GPS unit's manufacturer and

marketer, asserting claims under the Ohio Products Liability Act, Ohio Revised Code 2307.71, *et

seq.*, based upon Garmin's purported failure to warn of the risks associated with the use of the GNS

430 by non-instrument rated pilots in visual flight conditions.  According to Plaintiffs, in the fatal

(5:07 CV 3401;5:07 CV 3402)

moments leading up to the crash, the Lancair pilots focused their attention on the GNS 430's display, flying the plane exclusively by manipulating the controls to keep the white icon on the magenta line, in dereliction of their duty to visually scan for other traffic by looking out the plane's windscreen.

These matters come before the Court on motions for summary judgment by Garmin, along with related motions in limine seeking to bar Plaintiffs from presenting the testimony of four expert witnesses, either to oppose summary judgment, or at any eventual trial of this matter.  For the reasons that follow, Garmin's motions for summary judgment are granted, and both cases are dismissed with prejudice.  Because Garmin is entitled to summary judgment even if the Court assumes the admissibility of Plaintiffs' proffered expert opinions, Garmin's motions in limine are denied as moot.

## I.  Factual and Procedural History

The demonstrable facts surrounding this terrible tragedy are, in large part, undisputed.

John "Jack" Plavcan owned the Lancair, a "home built" single engine low-wing aircraft he personally constructed over the course of approximately ten years.  Plavcan's impeccable craftsmanship on the Lancair earned the plane a prestigious workmanship award from the Experimental Aircraft Association.  The Lancair had two seats, arranged side-by-side, both with full sets of controls.  Plavcan purchased the GNS 430 and installed it in the Lancair in 2004, roughly a year prior to the crash.

Plavcan held a private pilot certificate and a third-class airman medical certificate with a corrective lenses restriction.  He was not instrument rated, limiting him to flying under visual flight rule ("VFR") conditions, which mandated at least 10 nautical miles of visibility.  His companion in

2

(5:07 CV 3401;5:07 CV 3402)

the Lancair on October 14, 2005, was Mark Schaden, a professional Learjet pilot.  Schaden held an airline transport pilot certificate with single and multiple engine ratings, a Learjet type rating, a flight instructor certificate, and an instrument rating.

On the day of the accident, Plavcan and Schaden flew the Lancair from Geauga County Airport in Middlefield, Ohio, to Carroll County Airport in Carrollton, Ohio, where they met a friend for lunch.  After lunch, they departed from Carroll County Airport at approximately 1:45 p.m., and headed for Portage County Airport in Ravenna, Ohio, where Schaden needed to stop to pay an aircraft repair bill.

Meanwhile, Erdovegi and Lyons departed Akron Fulton International Airport in the single engine Cessna, with Erdovegi occupying the left seat and receiving instrument flight training from Lyons, who occupied the right seat.  Lyons held a commercial pilot certificate with single engine, multiple engine, and instrument ratings; a first class airman medical certificate with no limitations; as well as a flight instructor certificate covering all three (single engine, multi-engine, and instrument) ratings.  Erdovegi held a private pilot certificate with a single engine land aircraft rating and a third class airman medical certificate with a corrective lenses restriction; at the time, he was enrolled in a training course in preparation for the instrument airplane practical test and had already completed 15.5 hours of instrument flight training.  The Cessna was owned by Hobart Aviation, Inc., and operated by American Winds Flight Academy, Inc., which offered flight lessons out of Akron Fulton International.  Lyons and Erdovegi took off at approximately 1:45 p.m., intending to return to Akron Fulton International in time for Lyons to begin a lesson with another student at 3:00 p.m.

Because the prevailing meteorological conditions allowed for visual-only flying, both flights were conducted under visual flight rules without flight plans.  Just after 2:05 p.m., the planes

3

(5:07 CV 3401;5:07 CV 3402)

collided in midair at an altitude between 2,300 and 2,500 feet.  The Lancair, traveling at a much faster 160 knots, overtook the slower Cessna, traveling at 112 knots.  Instead of following the applicable flight rules, which mandated that the Lancair, as the overtaking aircraft, yield the right-of-way to the Cessna while maintaining vigilance to "see and avoid" other aircraft, *see* 14 C.F.R. § 91.113, the Lancair did not yield.  Instead, it collided with the side of the Cessna at a crossing angle of approximately 61 degrees. A witness who saw the planes just prior to the crash observed them both in straight and level flight, noting that neither made any apparent effort to avoid the collision.

The disputes in this case concern matters the parties agree cannot be determined with absolute certainty.  Unlike commercial airliners, the small planes involved in this crash were not outfitted with cockpit voice recorders.  And, tragically, none of the four victims lived to tell what happened at the controls during the final fateful moments.  This lack of a definitive record leaves the parties with considerable room to argue over the accident's cause.  Plaintiffs attempt to fill the void with expert testimony from four individuals–Anthony Hurst, Dr. Robert Sugarman, Christopher Beskar, and Charles Wentz.

Despite the absence of any firsthand accounts from the perspective of the pilots, the record does include some objective data.  The National Transportation Safety Board investigated the crash and prepared a Blue Ribbon Report, which concludes that the Cessna would have been visible to the pilots of the Lancair during the last 40 seconds leading up to the collision.  The NTSB Report includes a copy of the radar track showing the path taken by the two planes.  Reviewing this radar track, Plaintiffs' experts describe the Lancair's path as a straight line, which they contend could only be produced by navigating using the GNS 430.  According to these experts, the straight character

4

(5:07 CV 3401;5:07 CV 3402)

of the Lancair's track rules out the possibility that the pilots employed any of the other three acknowledged methods of flying—dead reckoning, pilotage, and VOR.[1]  Thus, Plaintiffs' experts conclude, the Lancair pilots must have been flying the plane by maintaining eye contact with the GNS 430 and manipulating the controls to keep the white plane icon on the magenta line—a process Plaintiffs refer to as "close tracking."  In doing so, the pilots abrogated their duty to look through the windscreen for other aircraft, and thus failed to see and avoid the Cessna in the final 40 or so seconds of the flight during which it should have been in plain view.

The GNS 430, the product at the heart of this controversy, is a multi-function GPS-based navigation and communication device that employs a network of 24 satellites to locate an aircraft's position.  Among its many functions, the GPS is capable of depicting the aircraft's changing position on a digital map display.  To use the map display, the operator selects the map display page and inputs a desired destination (such as an airport), and the unit then displays the desired course as a magenta line on the map, marking the aircraft's position on that course with a white airplane icon. As the plane progresses on the course during flight, the map display moves to reflect the aircraft's position relative to the magenta line.  In addition to the map display function, the GNS 430 can also display screens showing: a digital course deviation indicator (which marks course deviations by the aircraft as a rectangular bar off of a center line); the aircraft's position by latitude, longitude, and altitude; satellite status information; vertical navigation information for purposes of descending to a desired altitude; and a variety of other text-based information.  The GNS 430 is widely available—counting its companion model, the GNS 530, Garmin has sold more than 100,000

---

[1] VOR stands for "VHF Omnidirectional Range," a form of ground-based VHF radio navigation.

(5:07 CV 3401;5:07 CV 3402)

units—to anyone willing to pay for it.  The packaging includes a Pilot's Guide and Reference Manual, 400/500 Series Display Interfaces Guide Addendum, and CD-ROM, but it remains undisputed that none of these materials contain any warning or instruction concerning the risk at issue in this case.

The crash prompted the filing of a series of lawsuits in the Common Pleas Court for Portage County, Ohio.  In one, Hobart Aviation and American Winds Flight Academy, the owner and operator, respectively, of the Cessna, asserted claims against Garmin International, Inc., Garmin Ltd., Garmin AT, Inc., Garmin ("Europe"), Ltd., and Garmin Corporation (collectively, "Garmin") alleging defective design of the GNS 430, failure to warn of the risk inherent in its use by non-instrument rated pilots, and "failure to train or instruct" in its appropriate use.  In a separate action, Larry Sliffe, the executor of Lyons's estate, asserted a set of identical claims.

Pursuant to 28 U.S.C. § 1441, Garmin removed these two actions to this Court on November 1, 2007.  Jurisdiction is proper based upon diversity of citizenship under 28 U.S.C. § 1332(a). Following discovery, Garmin moved for summary judgment on all claims asserted against it in both actions (Doc. No. 115), and simultaneously moved in limine to prevent Plaintiffs from employing the expert testimony of Charles Wentz (Doc. No. 117), Anthony Hurst (Doc. No. 118), Dr. Robert Sugarman (Doc. No. 119), and Christopher Beskar (Doc. No. 120), either to oppose summary judgment or at any eventual trial.  Plaintiffs opposed Garmin's motion for summary judgment, (Doc. No. 127), and filed a single consolidated opposition to the motions in limine, (Doc. No. 124). Garmin filed replies in support of its summary judgment motion, (Doc. No. 129) and its motions in limine, (Doc. No. 125).  With leave of Court, Plaintiffs filed a sur-reply, (Doc. No. 131), to which Garmin responded, (Doc. No. 133).  The Court heard oral argument on the motion on July 9, 2010,

6

(5:07 CV 3401;5:07 CV 3402)

and accepted simultaneous supplemental briefs from both sides. (Doc. Nos. 140 & 141).  The motions are now ripe for decision.

## II.  Law & Analysis

### A.  Standard of Review

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  When considering a motion for summary judgment, the court must draw all reasonable inferences in the record in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The court may not weigh the evidence or determine the truth of any matter in dispute; rather the court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

### B.  Counts One ("Defective or Negligent Design") and Three ("Failure to Train or Instruct")

Plaintiffs' Third Amended Complaint sets forth causes of actions alleging that Garmin defectively or negligently designed the GNS 430 and failed to properly train or instruct customers, including Plavcan, in appropriate use of the device.  In its motion for summary judgment, Garmin points out that the OPLA abrogates all common law product liability claims accruing after April 7, 2005.  Ohio Rev. Code § 2307.71(B); *Wimbush v. Wyeth*, No. 09-3380, --- F.3d ----, 2010 WL 3250629, at *3 (6th Cir. Aug. 18, 2010).  Although the statute recognizes claims for defective design, Ohio Rev. Code § 2307.75, and inadequate warnings or instructions, Ohio Rev. Code § 2307.76, it does not recognize any claim for failure to train.  In their opposition, Plaintiffs expressly

7

(5:07 CV 3401;5:07 CV 3402)

abandon any defective design claim and make no effort to support an independent claim for failure to train, instead focusing exclusively on supporting their claim that the GNS 430 was defective under Ohio Revised Code § 2307.76 due to inadequate warnings or instructions.  Accordingly, Garmin's unopposed request for summary judgment on Counts One and Three of the Third Amended Complaint is granted.

### C.  Count Two ("Failure to Warn")

To successfully impose liability on a manufacturer of a defective product based upon inadequate warnings or instructions, the plaintiff must establish that at the time the product left the manufacturer's control or post-marketing, both of the following applied:

> (a) The manufacturer knew or, in the exercise of reasonable care, should have known about a risk that is associated with the product and that allegedly caused harm for which the claimant seeks to recover compensatory damages; and

> (b) The manufacturer failed to provide the warning or instruction that a manufacturer exercising reasonable care would have provided concerning that risk, in light of the likelihood that the product would cause harm of the type for which the claimant seeks to recover compensatory damages and in light of the likely seriousness of that harm.

Ohio Rev. Code § 2307.76(A)(1) & (2).  "Under Ohio law, a plaintiff asserting a products liability 'claim [] based on failure to provide adequate warnings not only must convince the fact finder that the warning provided is unreasonable, hence inadequate, but he also must establish the existence of proximate cause between the [product] and the fact of the plaintiff's injury." *Hisrich v. Volvo Cars of N. Am., Inc.*, 226 F.3d 445, 450–51 (6th Cir. 2000) (quoting *Seley v. G.D. Searle Co.*, 67 Ohio St. 2d 192, 199–200 (1981)).

Garmin asserts entitlement to summary judgment on grounds that (1) Plaintiffs lack evidence to support a finding that Garmin knew or should have known of the alleged risk; (2) the purported

8

(5:07 CV 3401;5:07 CV 3402)

risk qualifies as "open and obvious" under Ohio Revised Code § 2307.76(B); and (3) as a matter of law, the GNS 430 was not the proximate cause of the accident.  Among the many arguments urged by Garmin, these three stand out because they do not implicate the admissibility of Plaintiffs' expert testimony.  For the reasons explained below, the Court finds each of these three arguments independently dispositive of Plaintiffs' failure to warn claim, and grants Garmin's motions for summary judgment on these grounds.  For purposes of this ruling, the Court assumes without deciding that the challenged expert opinion testimony proffered by Plaintiffs would be admissible under Federal Rule of Evidence 702 and, finding that Garmin is nevertheless entitled to summary judgment, denies Garmin's motions in limine as moot.

### 1.  Knowledge of the Risk

To succeed on their failure to warn claim, Plaintiffs must establish that "[t]he manufacturer knew or, in the exercise of reasonable care, should have known" of the risk about which it failed to warn.  Ohio Rev. Code § 2307.76(A); *see also Crislip v. TCH Liquidating Co.*, 52 Ohio St. 3d 251, 257 (1990).  Garmin argues that Plaintiffs lack evidence to create a genuine issue of material fact as to its knowledge of the risk, either direct or constructive.

Plaintiffs first respond that Garmin knew of the risk that a VFR pilot would use the GNS 430 to "closely track" the airplane icon along the magenta line simply because the device is capable of performing that function, and Garmin, as its manufacturer, designed it that way.  But this formulation of the risk is overly simplistic.  The risk at issue in this case is not just that a VFR pilot would use the GNS 430 for close tracking, but that he would do so *in abrogation of his federally-mandated duty to visually scan through the windscreen for other aircraft*.  This is necessarily so because: (1) the evidence remains undisputed that all pilots flying under VFR conditions (as the

9

(5:07 CV 3401;5:07 CV 3402)

Lancair pilots were on October 14, 2005) know they have an unflinching duty to maintain vigilance in scanning for traffic by looking through the windscreen; and (2) there is no evidence (or even a suggestion) that the GNS 430 presents any danger if used by a pilot who adheres to his duty to scan for traffic.  Because the risk at issue necessarily incorporates a lack of attentiveness to the pilot's outside visual scan, Plaintiffs cannot show that Garmin knew or should have known of the risk merely by pointing to the design of the GNS 430.  The mere *possibility* that the device could be used in a dangerous fashion *if* a pilot disregarded his acknowledged duty to scan for other traffic—a duty specifically put in place to ensure safe flight practices—does not suffice to establish Garmin's knowledge of the risk that it would, in fact, be used that way.

Next, Plaintiffs assert that Garmin's marketing of a traffic advisory system capable of being coupled with the GNS 430 to show other traffic in the vicinity evinces knowledge of the risk. According to Plaintiffs, a traffic advisory system would be "superfluous" for instrument rated pilots flying in instrument flight rule ("IFR") conditions because Air Traffic Control advises them of nearby traffic, and therefore the product must be targeted at VFR pilots who use the GNS 430. Thus, Plaintiffs argue, Garmin's marketing of the traffic advisory system shows its knowledge of the risk inherent in the GNS 430's stand-alone use by VFR pilots—why would anyone need a traffic advisory system to pair with the GNS 430 unless the GNS 430 by itself created a risk of losing track of nearby traffic?

This argument falters on both its flawed logic and lack of evidentiary support.  The absence of a risk from using two products together (here, the GNS 430 and the traffic advisory system) is not evidence that using one product alone (the GNS 430) in fact poses the risk.  This is like trying to prove that a manufacturer's dog leash poses a dangerous risk of breaking because the same company

10

(5:07 CV 3401;5:07 CV 3402)

also happens to sell a fence, which, if used in connection with the leash, would alleviate the risk. The GNS 430 may present the risk Plaintiffs complain of, or it may not, but it does not present that risk *because* Garmin sells a traffic advisory system that would not present the risk.  Moreover, Plaintiffs rely entirely on the flawed logical conclusion that the traffic advisory system's marketing suffices to demonstrate knowledge of the risk—they present no evidence to back their assertion. The record stands devoid of evidence that Garmin designed and marketed the traffic advisory system in response to a risk created by the GNS 430.  Accordingly, evidence of the traffic advisory system's marketing fails to establish a genuine issue as to Garmin's knowledge of the risk allegedly posed by the GNS 430.

Finally, Plaintiffs fault Garmin for failing to conduct a proper "human factors" study using VFR-rated (as opposed to instrument-rated) pilots, which Plaintiffs claim would have disclosed the risk they complain of.  In support of this contention, Plaintiffs rely on evidence that Garmin knew of the skill-level differences between VFR and IFR pilots, that the Federal Aviation Administration used the GNS 430 during certification flights and provided feedback to Garmin concerning "collision avoidance" and a pilot's ability to use the device while performing other tasks, and that the FAA sent Garmin correspondence noting that "human factors involvement and evaluation is strongly recommended to ensure this system can provide for adequate task performance without undue pilot workload."  Garmin admits that neither it nor the FAA performed human factors testing limited to VFR pilots.

This evidence demonstrates, at best, that Garmin never conducted human factors testing with VFR pilots, as the FAA arguably recommended.  It does not, however, establish what that testing would have revealed had it been conducted.  Although the FAA asked its test pilots general

11

(5:07 CV 3401;5:07 CV 3402)

questions about collision avoidance and simultaneous task performance issues, the test returns supplied no evidence of the risk at the heart of Plaintiffs' claim.  And despite the opportunity to do so, Plaintiffs never performed the VFR pilot-specific testing themselves, and thus lack any evidence that it would have, as they suggest, put Garmin on notice of the risk that VFR pilots would use the GNS 430 for close tracking in dereliction of their obligation to scan through the windscreen for traffic.  So while it is theoretically possible that a pilot tasked with performing a test flight using the GNS 430 would report back an inability to use the device for navigation while simultaneously adhering to his scanning duty, Plaintiffs present no evidence that any pilot has ever done so.  Thus, their complaint that Garmin failed to conduct appropriate human factors testing fails to establish a genuine issue about whether the company should have known of the alleged risk.

### 2.  Open and Obvious

Under Ohio law, failure to warn or instruct "about open and obvious risks or a risk that is a matter of common knowledge" does not render a product defective.  Ohio Rev. Code § 2307.73(B).  A risk qualifies as open and obvious when its "dangers are within the body of knowledge common to the community" and "generally known and recognized by the ordinary consumer."  *Gawloski v. Miller Brewing Co.*, 96 Ohio App. 3d 160, 163 (7th Dist. 1994).  Whether a risk meets the "common knowledge" standard "is determined by reference to the industry in which the product is used."  *Midwest Specialties, Inc. v. Crown Indus. Prods.*, 940 F. Supp. 1160, 1167 (N.D. Ohio 1996).  "Where only one conclusion can be drawn from the established facts, the issue

12

(5:07 CV 3401;5:07 CV 3402)

of whether a risk was open and obvious may be decided by the court as a matter of law." *Doe v. SexSearch.com*, 551 F.3d 412, 420 (6th Cir. 2008) (quoting *Klauss v. Marc Glassman, Inc.*, No. 84799, 2005 WL 678984, at *3 (Ohio App. 8th Dist. Mar. 24, 2005)).

Garmin requests summary judgment on grounds that the risk at issue qualifies as "open and obvious," absolving it of any potential liability under the statute. Plaintiffs put up little resistance to Garmin's factual contention that any reasonable pilot would understand the risk of harm associated with navigating using the GNS 430 in abdication of the duty to maintain a visual scan outside the aircraft. To begin with, FAA regulations mandate that all pilots observe their duty to see and avoid other aircraft. 14 C.F.R. § 91.113(b). And Plaintiffs' own experts agree that basic flight training teaches pilots about the importance of fulfilling this duty and avoiding spending excessive time looking at their instruments while flying in VFR conditions. Plaintiffs' experts further concede that the risk inherent in failing to maintain the required visual scan includes the possibility of causing a mid-air collision and death, and that this risk is a matter of common knowledge among pilots.

Rather than disputing the open and obvious character of the risk, Plaintiffs claim that the question nevertheless falls within the province of the jury. To be sure, in situations "where reasonable minds could differ with respect to whether a danger is open and obvious," the question falls to the jury. *Cf. Henry v. Dollar General Store*, No. 2002-CA-47, 2003 WL 139773, at *2 (Ohio App. 2d Dist. Jan 17, 2003). But where the established facts permit only one conclusion, the court properly decides the open and obvious question as a matter of law. *Doe*, 551 F.3d at 420. Here, Plaintiffs fails to adduce any evidence to contradict Garmin's assertion that the risk qualifies as open and obvious. Indeed, Plaintiffs' own experts concede the "common knowledge" status of the risk.

13

(5:07 CV 3401;5:07 CV 3402)

Nevertheless, seeking to avert summary judgment, Plaintiffs argue that a pilot's duty to see and avoid is too general, and fails to demonstrate that the *specific* risk posed by the GNS 430 is open and obvious.  But, as explained above, the risk at the heart of Plaintiffs' complaint necessarily incorporates a pilot's failure to observe his duty to scan through the windscreen for other aircraft; their own formulation of the risk acknowledges as much—"[t]he specific risk . . . is that a VFR pilot would use the moving map display on the GNS 430 to navigate by closely tracking the white plane along the magenta course line, *thereby interfering with the pilot's duty to scan through the windscreen* and to see and avoid other aircraft or obstacles."  (Pl.'s Opp'n to Summ. J., at 20.)  The undisputed evidence reveals the open and obvious character of this specific risk.  The record establishes not just that flying a plane without looking out the windscreen risks a mid-air collision and death, but that flying a plane by using the GNS 430 for close tracking to the exclusion of the pilot's duty to maintain a visual scan for other aircraft presents that risk.  This satisfies Garmin's burden of establishing the open and obvious character of the risk with the requisite specificity.

In light of the unanimous consensus acknowledging that the risk associated with using the GNS 430 to navigate without maintaining a vigilant scan for other aircraft is common knowledge among reasonable pilots, the Court finds that Plaintiffs fail to establish a genuine issue of material fact to counter Garmin's open and obvious defense, entitling Garmin to summary judgment.

### 3.  Proximate Cause

Causation in product liability cases consists of two components: (1) direct cause "in fact" or "but for" cause; and (2) proximate or legal cause.  *State Auto Mut. Ins. Co. v. Chrysler Corp.*, 36 Ohio St. 2d 151, 156 (1973).  Assuming the admissibility of their expert testimony, Plaintiffs present sufficient evidence to defeat summary judgment on direct causation.  Their experts opine that the

14

(5:07 CV 3401;5:07 CV 3402)

crash resulted from the Lancair pilots using the GNS 430 for close tracking without conducting a visual scan for nearby aircraft, which, had they performed it, would have revealed the presence of the Cessna in sufficient time to avert the collision. Accordingly, for purposes of this memorandum opinion, the Court confines its analysis to the second part of the causation issue, which does not implicate the contested expert testimony.

Proximate or legal cause exists where the plaintiff's injury was the natural and probable consequence of the defendant's wrongful act (here, the purported failure to warn), and such injury could have been foreseen, in light of the attending circumstances. *Aldridge v. Reckart Equip. Co.*, No. 04CA17, 2006 WL 2716696, at *24 (Ohio App. 4th Dist. Sept. 16, 2006). "'[L]egal responsibility must be limited to those causes which are so closely connected with the result and of such significance that the law is justified in imposing liability.'" *Johnson v. Univ. Hosp. of Cleveland*, 44 Ohio St. 3d 49, 57 (1989) (citation omitted). Where a force intervenes between the defendant's conduct and the plaintiff's injury, it may relieve the defendant of liability by severing the requisite causal connection. *Leibreich v. A.J. Refrigeration, Inc.*, 67 Ohio St. 3d 266, 269 (1993). An intervening, superseding cause severs the causal chain and relieves the original actor of liability where it represents "a conscious and responsible agency which could or should have eliminated the hazard," and was not "reasonably foreseeable" by the original actor. *Cascone v. Herb Kay Co.*, 6 Ohio St. 3d 155, 159 (1983). Although typically a jury question, "if the plaintiff's evidence on the issue of proximate cause requires mere speculation and conjecture to determine the cause of the event at issue, then the defendant is entitled to summary judgment." *Nye v. CSX Transp., Inc.*, 437 F.3d 556, 564 (6th Cir. 2006); *see also Grieshop v. Hoyng*, No. 10-06-27, 2007

15

(5:07 CV 3401;5:07 CV 3402)

WL 1663516, at *6 (Ohio App. 3d Dist. June 11, 2007) (upholding superseding cause determination at summary judgment stage).

According to Garmin, even if Plaintiffs' expert guesswork regarding what occurred at the controls of the Lancair in the final moment prior to the crash is completely correct, the GNS 430 cannot qualify as the legal cause of Plaintiffs' injuries.  Garmin relies on cases outside this jurisdiction involving claims brought by individuals injured as a result of motor vehicle collisions caused by distracted drivers.  For instance, in *Silber v. Motorola, Inc.*, 274 A.D.2d 511 (N.Y. App. Div. 2000), a motorist talking on a Motorola phone became distracted by a problem with the phone's cradle, took her eyes off the road, crossed into opposing traffic and collided with a vehicle driven by the plaintiff, who brought suit against Motorola and the manufacturer of the cradle.  The New York Supreme Court, Appellate Division, affirmed the trial court's grant of summary judgment to the defendants, finding "that the defendants' actions were not a proximate cause of the accident and that, in any event, the actions of the Explorer's driver were a superseding cause of the plaintiffs' injuries."  *Id.*  Similarly, in *McCray v. Myers*, 614 So.2d 587 (Fla. App. 1st Dist. 1993), a motorist injured by another driver distracted by a billboard sued the landowners on whose property the billboard stood.  The Florida District Court of Appeal upheld the summary judgment in the defendants' favor, finding an absence of proximate cause.  The court explained that "[i]t would defy logic in the present case to permit a jury to consider the existence of legal causation."  *Id.* at 590.

Ohio law on proximate causation in general, and superseding causes in particular, aligns with the cases cited by Garmin; indeed, Plaintiffs do not argue otherwise.  Instead, their only effort to distinguish Garmin's authorities consists of asserting that, unlike a cell phone or billboard, the GNS

16

(5:07 CV 3401;5:07 CV 3402)

430 is intended for use as a navigational aid.  Contrary to Plaintiffs' contention, this distinction makes no difference.  The two-part superseding cause inquiry turns not on the intended use of the product, but on whether the responsible actors (here, the Lancair pilots) could or should have eliminated the hazard, and whether their conduct was reasonably foreseeable by the original actor (Garmin).  It remains undisputed that the Lancair pilots could have avoided disaster by maintaining a visual scan.  Indeed, Plaintiffs' experts explained that the Cessna would have been visible from the Lancair for approximately 40 seconds prior the crash, which all agree would have supplied ample time to execute an evasive maneuver.  And, as explained previously, Plaintiffs fail to put forth any evidence that Garmin knew or should have known of the risk that the pilots would abdicate their federally-mandated duty to maintain a visual scan for outside traffic by navigating solely via the GNS 430.

The fact that, unlike a cell phone or a billboard, the GNS 430 serves a navigational purpose has no bearing on whether the superseding actions of its user absolve the manufacturer of liability. Vehicles can be equipped with all sorts of navigational aids: some have compasses, others have built-in (or portable) navigation devices; drivers can use paper maps; or even pull up directions on their cell phones.  But drivers, just like VFR pilots, learn in the most basic training that they cannot focus on any of these types of navigational aids to the exclusion of their duty to look outside for nearby traffic without risking a collision that could result in death.  In this way, the GNS 430 is not materially different from a paper map, navigation device, or cell phone map application.  Yet Plaintiffs fail to supply a single authority supporting a proximate cause finding under any such circumstance.  That failure stems from well-established principles of tort law, which cut off liability where the responsible actor could or should have intervened to eliminate the hazard by observing

17

(5:07 CV 3401;5:07 CV 3402)

their unquestioned duty to remain vigilant in watching for outside traffic.  As the court in *McCray* put it, a contrary rule "would be at odds with reasonable notions of individual responsibility." 614 So.2d at 590.  Accordingly, the Court finds that the Lancair pilots' inattention to their duty to maintain a visual scan severed any causal connection between Garmin's alleged failure to warn and Plaintiffs' injury as a matter of law.

For these reasons, summary judgment is warranted in Garmin's favor due to the lack of proximate causation.[2]

**III. Conclusion**

Plaintiffs' failure to establish a genuine issue of material fact as to (1) Garmin's knowledge of the risk, (2) the open and obvious nature of the risk, and (3) proximate causation, entitles Garmin to summary judgment on these three independent bases.  As a result, Garmin's motions for summary judgment in cases 5:07-CV-3401 (Doc. No. 115) and 5:07-CV-3402 (Doc. No. 113) are GRANTED and these actions are DISMISSED with prejudice.

---

[2]In Case No. 5:07-CV-3402 Garmin separately moved for summary judgment on the survivorship and punitive damages claims asserted by Lyons's estate.  Because, as explained in this memorandum opinion, Garmin is entitled to summary judgment on the merits of the underlying claims, the motion is moot.

(5:07 CV 3401;5:07 CV 3402)

In light of these rulings, Garmin's motions in limine (Case No. 5:07-CV-3401, Doc. Nos. 117, 118, 119, and 120; Case No. 5:07-CV-3402, Doc. Nos. 117, 118, 119, and 120), and its separate motion for summary judgment in Case No. 5:07-CV-3402 relative to the estate's survivorship and punitive damages claims (Doc. No. 115) are DENIED AS MOOT.

IT IS SO ORDERED.

  September 17, 2010                         */s/ David D. Dowd, Jr.*
Date                                        David D. Dowd, Jr
                                            U.S. District Judge

19